**Charles V. HANSON, III**

v.

**UNITED STATES of America.**

**No. B–88–0949–CA.**

United States District Court, E.D. Texas, Beaumont Division.

May 4, 1989.

Walter Umphrey, Umphrey, Swearingen, Eddins & Carver, Beaumont, Tex., for petitioner.

Barbara C. Luke, Office of Regional Counsel, U.S.E.P.A., Dallas, Tex., for respondent.

## ORDER AFFIRMING CIVIL PENALTY ASSESSMENT BY THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

SCHELL, District Judge.

This is an appeal by Charles V. Hanson, III, Respondent, from a civil penalty order

issued against him by the United States Environmental Protection Agency (EPA) pursuant to section 309(g) of the Clean Water Act (the Act) [33 U.S.C. § 1319(g)]. The standard for judicial review of this administrative order is set forth in section 309(g)(8) of the Act, which prohibits the court from setting aside or remanding the agency's order "unless there is not substantial evidence in the record, taken as a whole, to support the finding of a violation" of section 301(a) of the Clean Water Act [33 U.S.C. § 1311(a)] or unless the agency's "assessment of the penalty constitutes an abuse of discretion." The court finds that there is substantial evidence in the agency record, taken as a whole, to support the finding of a violation of section 301(a) of the Clean Water Act and that the agency did not abuse its discretion in assessing the penalty. Accordingly, the court concludes that the EPA's penalty order should be AFFIRMED.

## I.  Exhaustion of Remedies

■ As a threshold issue, EPA contends that Hanson should be precluded from bringing this appeal, because he failed first to exhaust his administrative remedies. EPA bases this contention upon the fact that, in response to EPA's Administrative Complaint which triggered this investigation and penalty assessment, Hanson at first requested and later withdrew a request for a hearing on the assessment under § 309(g)(2)(A). This court finds EPA's contention meritless.

Section 309(g)(2) of the statute requires EPA to give the person against whom a Class I civil penalty is *proposed* written notice thereof and the opportunity to request a hearing on the proposed order. 33 U.S.C. § 1319(g)(2)(A) (Supp.1988). Section 309(g)(8) gives any person against whom a penalty is *assessed* the right to appeal the assessment to federal district court for review. Neither of these provisions, standing alone or in concert, imposes any *duty* upon such person to request, nor conditions the right of appeal upon exercise of the right to, a pre-assessment hearing. Each subsection of the statute stands independently of and with equal dignity to the

other, and the appeal provision nowhere mentions any hearing, required or otherwise. EPA's assertion of exhaustion of remedies is DENIED.

## II.  Review of the Record

This court must make essentially two inquiries in the course of reviewing the agency record. First, the court must determine whether or not there is substantial evidence in the record to support the finding made by the EPA that Mr. Hanson violated section 301(a) of the Act. Second, the court must determine whether the EPA abused its discretion in assessing a penalty of $24,000.

### A.  *Violation of the Act*

Section 301(a) of the Act provides:

Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act [33 U.S.C. §§ 1312, 1316, 1317, 1328, 1342, 1344], the discharge of any pollutant by any person shall be unlawful.

■ The record is clear that Mr. Hanson's activities did not fall under any of the compliance exceptions mentioned in 301(a). Mr. Hanson, admittedly, did not have a permit to discharge fill material into navigable waters as required by section 404. Therefore, the question is whether or not Mr. Hanson engaged in the "discharge of any pollutant" into "navigable waters" as prohibited by section 301(a).

Section 502(12) [33 U.S.C. § 1362(12)] provides:

The term "discharge of a pollutant" and the term "discharge of pollutants" each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.

Section 502(6) [33 U.S.C. § 1362(6)] provides in pertinent part:

The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar

dirt and industrial, municipal, and agricultural waste discharged into water.

It stands as well established that "fill material" constitutes a pollutant under the foregoing definitions. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922–24 (5th Cir.1983) (even redeposit of native materials bulldozed and uprooted during land clearing activities constitutes discharge of pollutants under the Act). The administrative record, including the field reports and photographs taken of this particular shoreline area, contains substantial evidence that the dirt, rock, bricks, sheet metal and other debris deposited by Mr. Hanson, or at his direction, constituted a "pollutant" under the Act.

■ Further, the record reveals that Keith Lake, upon the shores of which the fill material was deposited, is subject to the tides of the Gulf of Mexico and is a navigable water of the United States. The record remains unclear as to whether or not Keith Lake is navigable in the traditional, "navigable-in-fact" sense, a characteristic suggested by the unfortunately undefined term in the Act. It is well established, however, that the term navigable waters means all "waters of the United States," comprising not only traditionally navigable waters, but all other waters interconnected therewith, including the territorial sea and all non-navigable intrastate tributaries whose misuse might affect interstate commerce. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 457, 88 L.Ed.2d 419 (1985). Further, the definition includes fresh water wetlands adjacent to such covered waters, even if only hydrologically interconnected therewith. *Id. See also* Comment, The Extent of Groundwater Jurisdiction Under the Clean Water Act After *Riverside Bayview Homes*, 47 La.L.Rev. 859, 861–75 (1987).

The record is sparse as to exactly when Keith Lake became interconnected with tidal waters. Mr. Hanson alleges it occurred through the activity of the Corps of Engineers (Corps) in establishing a "fish cut" into the lake, and that it had theretofore been a private, unregulated lake. It is clear, though, that such interconnection occurred before the specific events relied upon by the EPA for this penalty, because Hanson admits that his filling operations were at least partly motivated by perceived detriments to his property from tidal activity and flooding that resulted.

■ Hanson disputes Corps jurisdiction under the Act by saying that Keith Lake was private property when he acquired his land. The fact that Corps activity may have extended jurisdiction under the Act to Hanson's land is of no import, however, in deciding whether or not he must submit to the Corps' permitting process under § 404 of the Act. *See Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (though a taking clause issue might arise upon denial of a § 404 permit, fact that previously landlocked lagoon was opened to the sea for navigation extended jurisdiction under the Act thereto, requiring § 404 permits for subsequent improvements). Since portions of Mr. Hanson's property are subject to tidal flooding, those portions necessarily are "waters of the United States" or adjacent wetlands, and Mr. Hanson must obtain a Corps permit before placing fill material thereon.

■ The record taken as a whole clearly establishes that at least three separate incidents of unpermitted placements occurred during times when Hanson was subject to the § 404 permitting process. In addition, the record also substantially establishes that later deposits occurred which are not covered by the penalty assessment. There is therefore substantial evidence in the record to support EPA's finding of a violation of the Act. At the time Hanson began his fill operations, whether directly into Keith Lake or upon the adjacent wetlands on his shore property, he should have obtained a § 404 permit from the Corps of Engineers. His failure to do so constituted a violation which the administrative procedures under § 309(g) empower EPA to penalize.

### B. *Abuse of Discretion*

■ Hanson alleges EPA abused its discretion in assessing the Class I penalty of $24,000 for his activities. He cites no fac-

tual or authoritative support for this contention.

The statutory limits on EPA for a Class I penalty are $25,000 per penalty and $10,000 per violation. 33 U.S.C. § 1319(g)(2)(A) (Supp.1988). The penalty assessed to Hanson clearly meets the overall maximum, but for the assessment also to fall within the $10,000 per violation, the record must show at least three independent events that constituted violations. This court finds substantial support in the record that at least three such violations occurred, thus supporting EPA's assessment.

EPA's Final Order adopted section II of the earlier Administrative Complaint which triggered the penalty process under § 309(g). In that latter document, paragraphs C.1, C.4, C.7, and C.10, EPA cited four deposits which, if supported by the record, would amply justify the penalty.

As to the first of these deposits, covered by paragraph C.1, it is not clear from the record that the "groin" area, discovery of which by Corps personnel led to this investigation and penalty, was deposited during Corps jurisdiction. No evidence of its earlier absence during Corps jurisdiction exists in the record, from which this court can infer it was deposited during Corps jurisdiction, even if Corps personnel familiar with the area recognized it as new. Thus, this alleged event cannot serve as a basis for the penalty.

As to the latter three events, covered by paragraphs C.4, C.7 and C.10, the record substantially establishes their creation during Corps jurisdiction with aerial and ground photographs and surveys both before and after the deposits were made. All three events occurred between the dates of April 29, 1986, and February 17, 1987, a period in which Corps jurisdiction under the Act clearly had matured. Thus, EPA's assessment falls within the statutory limitations imposed upon EPA discretion for Class I penalties.

As to whether or not EPA abused its discretion in assessing nearly the maximum it could under the statute, the record also substantially supports the decision. Both EPA and the Corps repeatedly attempted to resolve the issues between the United States and Hanson before assessing the penalties. Hanson apparently ignored offers to let him apply for the § 404 permit "after-the-fact" without reprisals for failure to timely file. Hanson violated three separate cease and desist orders, and failed to respond to repeated oral and written correspondence attempting to get him to comply. Finally, he violated EPA's Administrative Order constituting an injunction from further unauthorized discharged and mandating restoration of the wetlands that had been damaged.

In light of the fact that the penalty is clearly within EPA's discretion under § 309(g), and in light of substantial support in the record to justify assessing it, this court finds that EPA did not abuse its discretion.

## CONCLUSION

For the foregoing reasons, EPA's penalty order is AFFIRMED.

SO ORDERED.